CULPEPPER, Judge.
Under LSA-R.S. 48:441 et seq., the State expropriated a portion of defendant’s land on which was located a wood preserving plant. Plaintiff deposited $44,278 in compensation for the land and improvements taken and for severance damages to the remaining land and wood-treating plant. The district judge awarded defendant $142,362, less the deposit. Plaintiff appealed.
The only issues on appeal concern the award of $9,473 for the portion of the plant buildings and equipment taken and $74,441 for severance damages to the portion of the plant buildings and equipment remaining after the taking. There is no dispute as to the value of the land taken or severance damages to the remaining land.
The plant was constructed in 1955 on 11.048 acres of land. It was used to treat raw wood products with chemical preservatives. Until 1957, the plant operation was supervised by Alvin C. Morgan, the president of Wood Preserving Service, Inc. However, due to his other business ventures, it became impossible for him to personally manage the plant. He testified that the closing of the plant was also due to the lack of available management personnel in the area.
In 1959, defendant entered a lease-purchase agreement for the sale of its plant to Gulf Wood Preserving Corporation. The rent of $15,000 was to be paid in five annual installments. Gulf also executed a promissory note in favor of defendant on November 1, 1959, in the amount of $60,000 payable in four annual installments.
*657 After an unsuccessful attempt to operate the plant, Gulf retroceded the plant to defendant in return for the surrender of its promissory note. On November 1, 1961, the lease was also canceled. The plant has not been operated since 1961.
On February 23, 1971, plaintiff took S.27 acres of defendant’s property for highway construction. The evidence clearly establishes that the plant had not been used for any purpose for at least eight years prior to the taking.
It was stipulated that: (1) There were two tracts remaining after the taking — the east tract containing 1.5 acres and the west tract containing 4.3 acres; (2) the value of the land taken is $38,048; (3) severance damage to the remaining 4.3-acre tract is $20,400; and (4) there is no severance damage to the remaining 1.5-acre tract. The principal issue concerns severance damages to the plant, which could not be operated on the small remaining land.
Mr. Normand Terry, defendant’s expert appraiser, testified as to the value of the plant immediately prior to the taking and its value immediately after the taking. He used the “value in use” concept or “reproduction cost less depreciation” method to determine its market value prior to the taking. After the taking, the plant was sold to Mr. Mackey Davis in June, 1972 for $25,000 and moved by him to Hatties-burg, Mississippi. Mr. Terry used the purchase price paid by Mr. Davis as the value of the plant after the taking.
It is well settled in our jurisprudence that the measure of severance damages is the difference between the value of the remaining property before and after the taking, State v. Mason, 254 La. 1035, 229 So.2d 89, 93 (1969); State v. M. G. Realty Company, Inc., 276 So.2d 918, 922 (La.App. 3rd Cir. 1973). Using this method of calculation, Mr. Terry found the severance damage to the plant to be $74,441.
Mr. Terry had never appraised secondhand equipment of a wood preserving plant. His decision to value the plant according to the “value in use” concept was based upon Kinard’s (William N. Kinard, Jr.) “Industrial Real Estate.” He relied heavily upon the following excerpt from Kinard’s book which outlines the factors to be considered by the appraiser before he desires to employ the “value in use” concept:
“Now the problem becomes complicated when the property in question is not properly exchanged in any identifiable market, nor does it fall into the rental category where sufficient rental data exists to constitute a basis for analysis resulting in a market value estimate. Value-in-use compensations can generally be justified when (1) the property is fulfilling identifiable economic demands for services provided, or which it houses, (2) the property improvements have a reasonable remaining economic life expectancy, (3) there is responsible ownership and constant competent management, (4) the diversion of the property to an alternate use will not be economically feasible, and (5) continuation of present use is assumed. When a preponderance of factors above appear, then it is appropriate that the appraiser, carefully qualifying his findings, issue an opinion of value-in-use. It is obvious that the cost approach must be relied on in such situations, but all measures of economic contribution of the real estate to the total going concern’s situation are considered relevant.” William N. Kin-ard, Jr. “Industrial Real Estate,” 2d Ed. page 418, footnote.
Mr. Terry admitted that the plant lacked competent management. However, he concluded that: (1) there is a readily identifiable economic demand for the services of this plant in southwest Louisiana, (2) the equipment has a reasonable, remaining economic life expectancy, (3) it will not be economically feasible to change the plant’s use, and (4) the economic use of the property was feasible.
*658 Under cross-examination, Mr. Terry testified that the criterion which assumes continued use means only that the plant need be capable of operating and does not mean that it has to be actually in use at the time of the taking. However, he admitted that Kinard’s theory of “value in use” is based principally on the factor that the land and improvements are presently being used as a gomg business. He attempts to explain the absence of this factor in the present case by saying that the failure to meet the “continued use” criterion by itself would not prevent the application of the “value in use” concept if a preponderance of the other five factors were established.
Mr. Francis Seale testified for the plaintiff as an expert in the operation and management of wood-treating plants. Although he did not qualify as an expert appraiser, his 28 years’ experience in the management of such operations clearly shows that he is particularly qualified to testify on the economic problems encountered in the industry in the area in question.
He testified that it would not be economically feasible to operate this plant in Lake Charles. This plant was the only one producing Penta treated wood products in the Lake Charles area. His testimony reflects that his plant in Hammond was not successful in its attempt to sell Penta products in the Lake Charles area because no one would purchase large enough quantities. In his opinion, the undeveloped market in the area would not generate the necessary volume to permit an economically feasible operation.
Mr. Seale also had experience purchasing second-hand equipment for wood-treating plants. He testified that “reproduction costs less depreciation” was not important to him when purchasing used equipment. The important factors to him were: (1) the adaptability of the equipment to his operations, (2) the condition of the equipment, and (3) the distance the equipment had to be transported to his plant. After his examination of the condition of the equipment in Hattiesburg and the remains of the plant in Lake Charles, he stated that he would offer $15,000 to the owner for the equipment in place at Lake Charles.
His testimony also shows that the plant in Lake Charles could get a supply of lumber for its operation in DeRidder. However, in his opinion, the trend for over five years in the industry had been the closing of small, independent plants due to the entry of large lumber companies into the wood-preserving business. These large companies increasingly refused to sell timber to independent operators. Over this period, he concluded that it had become exceedingly difficult for the small plants to remain in operation.
To refute the valuation of the plant by Mr. Terry before the taking, plaintiff elicited testimony relating to a 1970 sale of a similar plant located in Harahan. Mr. Seale testified that the purchase price paid for that plant was $25,000. He stated that the entire plant, including the equipment, was then moved from Harahan to Slaughter. His testimony reflects that this transaction was widely known throughout the industry.
Mr. Terry was not familiar with the Harahan sale. Consequently, he did not consider it as a factor when valuing the Lake Charles plant prior to the taking. When posed with the hypothetical sale of the plant in Harahan, Mr. Terry dismissed it as being too speculative. He said the sale of the plant in Harahan would have no bearing on the value of the Lake Charles plant before the taking because the circumstances surrounding that sale may not have been similar to those affecting the Lake Charles plant.
However, under cross-examination, he testified that his conclusions would not be accurate if it were shown that the plant in Harahan could not be operated economically. He also stated that the purchase price of the plant in Harahan would be indicative of fair market value of a wood-treat *659 ing plant at that time based purely upon the hypothetical posed without considering any other reasons prompting the sale.
Counsel for defendant cites as authority the principle of law in expropriation proceedings that the trial court may not substitute its own appraisal for those of expert witnesses when such appraisals are well reasoned and are not contradicted, State v. Goudeau, 276 So.2d 923 (La.App. 3rd Cir. 1973). He also cites the rule that the trial court’s evaluation of the testimony of expert witnesses should not be disturbed on appeal in the absence of manifest error, State v. Chesson, 229 So.2d 763 (La.App. 3rd Cir. 1970).
Two other expert appraisers, Jules Rei-nauer and Moses Abelman, testified that the method used by Mr. Terry was based on sound appraisal techniques and was often employed to value industrial property. From this testimony, the trial judge concluded that the technique used by Mr. Terry was well-reasoned.
Counsel also argues that the testimony of Mr. Seale does not contradict the appraisal technique used by Mr. Terry because Seale was not accepted as an expert appraiser.
Counsel for the Department contends that the “value in use” concept employed by Mr. Terry could not be used to value a plant which had not been operated for more than eight years. He argues that the acceptance of the appraisal method used by Mr. Terry will lead to a ridiculous result.
Mr. Terry had never previously appraised second-hand equipment at a wood-treating plant. Nor had he ever used the “value in use” concept to value property. His decision to employ that method resulted primarily from the research he had done in Kinard's text. It is admitted that the basic premise of Kinard’s work is that the land and improvements must actually be in use at the time of the taking to justify application of the “value in use” concept to industrial property. We would have no problem accepting the appraisal technique employed by Terry if the plant had been a going concern at the time of the taking. But the fact is that the plant had not been operated for over eight years and the evidence convinces us that it could not be economically operated in that area.
Mr. Terry admitted that there was a lack of continuous, competent management to run the plant. Mr. Seale testified that the market in Lake Charles had not developed sufficiently to permit the economical operation of the plant in that area.
Therefore, we conclude the appraisal technique employed by Mr. Terry was not well reasoned. We conclude further that the testimony of Mr. Seale is directly contradictory to that of Mr. Terry that there was a readily identifiable economic demand for the services of defendant’s plant in the area. Consequently, we find the trial court erred in approving the appraisal technique used by Mr. Terry.
The following principles stated in State v. William T. Burton Industries, Inc., 219 So.2d 837, 840 (La.App. 3rd Cir. 1969) are applicable:
“Under ‘quick-taking’ expropriations such as this, the market value of the land taken is determined as of the time of the taking, but the ‘damage’ to the remainder is determined as of the date of the trial. LSA-R.S. 48:453. The defendant landowner has the burden of proving his claim for such severance damages. Id.
“[2,3] Essentially, the severance damage sustained by a remainder is the difference in its market value caused by the taking. State Through Dept. of Highways v. Central Realty Investment Co., 238 La. 965, 117 So.2d 761; State Through Dept. of Highways v. Waterbury, La.App. 3d Cir., 171 So.2d 790.”
Defendant sought to' introduce evidence to show that the plant was closed and could not be sold due to the impending *660 highway construction. The trial judge excluded this testimony, but allowed its introduction under an offer of proof. Assuming the evidence should be considered, it would not change our decision. Of course, even if potential buyers would not have purchased the plant due to the proposed highway construction, defendant could have continued its operation until the date of the taking. But it did not.
We conclude defendant has failed to prove any severance damage to its plant caused by the taking. The value of the remainder of the plant both at the time of the taking and at the time of trial is fixed at no more than the sum of $25,000 for which defendant sold it in 1972. See State v. Mayer, 257 So.2d 723, 743 (La.App. 1st Cir. 1971), writ refused 261 La. 460, 259 So.2d 913 (1972).
In oral argument, counsel for plaintiff admitted that the Department must compensate defendant for the improvements on the property taken, according to its appraised value of $9,473, though he still complained that this amount was excessive. The judgment in this regard must be affirmed.
For the reasons assigned, we reverse and set aside the trial court’s judgment insofar as it awarded severance damages in the sum of $74,441 for the portion of defendant’s plant not taken. The judgment is reduced by that amount. Otherwise, the judgment is affirmed. All costs of this appeal are assessed against the defendant.
Reversed in part and affirmed in part.